BRUNNER v. UNITED STATES et al.

District Court, S .D. New York.

Aug. 5, 1947.

Gay & Behrens, of New York City (Russell C. Gay, of New York City, of counsel), for libelant.

John F. X. McGohey, of New York City (Lloyd, Decker, Williams & Knauth and Gray Williams, all of New York City, of counsel), for respondents United States and American Hawaiian Steamship Co.

Macklin, Brown, Lenahan & Speer, of New York City (Leo F. Hanan, of New York City, of counsel), for Moran Towing & Transportation Co., Inc.

COXE, District Judge.

This is a suit for personal injuries sustained by the libelant at about 8:30 AM on July 16, 1945, while employed as second mate on the S/S "Sheepshead Bay Victory," a ship owned by the respondent United States of America, and operated under a general agency agreement by the respondent American-Hawaiian Steamship Company. A claim asserted in the libel for maintenance and cure has been withdrawn by the libelant.

The ship was at the time in the process of docking on the south side of the rack located to the north of Pier 6, Hoboken, N. J., and was being assisted by the tugs "Allentown" and "William C. Moore," both operated by the respondent Moran Towing & Transportation Co., Inc.

The "Allentown" had taken a hawser off the starboard stern of the ship and was proceeding upstream in the Hudson River in order to pull the stern towards the rack and enable the ship to be moored bow in on the rack's south side. The libelant received his injuries when the fourth and fifth fingers of his left hand were crushed between the roller of the fairlead at the stern of the ship and the hawser running to the "Allentown."

The libel alleges that the ship was unseaworthy, and charges various acts of negligence on the part of the respondents; but at the trial only one critical issue emerged, namely, whether the "Allentown" went forward on her engines, without warning to the libelant, and, in doing so, tightened up on the part of the hawser on which the libelant had his hand when he was injured.

The "Sheepshead Bay Victory" was a new vessel, and had come to New York from Baltimore on her first voyage to be fitted out as a troop ship. There is nothing in the evidence to show that any part of her equipment was old, defective or unseaworthy. The ship arrived off the rack at Hoboken at about 8:00 AM on July 16th; she was then light, heading up the river, and had a free board at the stern of about 35 feet. The weather was fair, with no wind, and the tide was strong ebb. The "Allentown" was at the stern of the ship, waiting for orders, and the "William C. Moore" was at the port bow. Captain Sjovall, master of the "William C. Moore," was acting as docking pilot, and stationed on the flying bridge of the ship.

The libelant was the only fact witness called in support of his side of the case. He testified that he is now 31 years old, and signed shipping articles as second mate on the "Sheepshead Bay Victory" on July 15th for a coastwise voyage to New York. He had previously been in cadet training for the Merchant Marine, from September to November 1942, and then served at sea as a cadet until July 1945. During his sea service he had acted as third mate and assisted at various times in the docking and undocking of ships. The voyage on the "Sheepshead Bay Vic-

tory" was his first voyage as second mate, and he was in charge of and responsible for the work being performed at the stern during the docking of the vessel at Hoboken.

The libelant, in his testimony, gave three different versions of the accident. In the first version he said that after the hawser had been passed to the "Allentown," and the tug had run out a short distance, the tug shouted to "take up slack". This was accomplished by using the fairlead and the capstan, and it then became necessary to put on a stopper to hold the slack which had been taken up. What subsequently transpired can best be stated in the libelant's own language, as follows:

"We did this, and before we had time to secure the hawser to the bitt, take it off the capstan and put it on the bitt, the tug went forward on the line and snapped the stopper. I shouted to the other tug that they would have to slack it again so we could secure it. They slacked off. I picked up the line. We were pressed for time, working desperately there, throwing it over the fairlead so it is slack enough to take turns around the bitt, when they went forward on the line and pulled my hand between the hawser and the fairlead and ground my fingers off."

The second version was given by the libelant at the beginning of his cross examination, and in it he not only explained some of his earlier testimony but stated that the parting of the stopper took place simultaneously with the crushing of his fingers in the fairlead—"it all happened at once." He also said that the ship had about 60 feet of hawser out when the tug shouted to "take up slack", and that the tug thereupon backed up and "must have given about 10 feet of slack" to be taken up on the capstan.

The third version came on further cross examination, after the libelant had been shown a signed statement to his employer, dated August 9, 1945, in which he made reference to the use of two stoppers instead of only one, as he had previously testified, and stated that each of the stoppers was a new sisal line. He testified that the first stopper was put on after the

slack in the hawser had been taken up, and that this stopper parted. He further said that after the first stopper parted he asked the tug to take the strain off the hawser and back up, and that this was done and a second stopper put on. Afterwards, the hawser was released on the capstan, and the libelant was engaged in throwing it over the fairlead to "get enough slack to whip around the bitts," when the hawser suddenly became taut and his hand was drawn into the fairlead. The libelant admitted that the second stopper did not part.

The respondents called as witnesses Captain Baker, master of the "Allentown"; Rerecich, deck hand on the "Allentown"; Captain Sjovall, master of the "William C. Moore," and Captain Knowles, master of the ship.

Captain Baker was in the pilot house of the "Allentown" during the docking operation, and was ordered by Captain Sjovall to take a hawser off the stern of the ship. This hawser ran through the starboard stern chock of the ship, and the eye was made fast on the stern bitt of the tug. Captain Baker said he told the mate on the stern of the ship to take a figure 8 turn on the stern bitts and then slack off the line until the tug blew a whistle, at which time the line was to be made fast The tug moved out against the tide about 200 feet, blew a one-whistle signal to the ship, and then stopped to enable the ship's crew to take further figure 8 turns on the stern bitts. The mate on the stern of the ship reported that the hawser was "all fast," and the tug proceeded slowly ahead until it was noticed that the hawser had started to render from the ship. The tug thereupon again stopped, and Captain Baker shouted to the ship "that the line was rendering" and "to make it fast." After remaining stopped for a short time the mate on the ship reported "All right, to come ahead," and the tug went ahead, pulled the ship into position and completed its assignment. Captain Baker denied that the tug at any time stopped to shorten the hawser, or that he had given any order to that effect. He insisted also that the operation could only be performed properly with a long hawser of "anything over 100

feet" in length, and that there was no necessity for shortening the hawser.

Rerecich was standing at the stern of the tug while the ship was being docked. He corroborated Captain Baker's testimony with respect to the movements of the tug and the rendering of the hawser. He said also that after the tug's second stop, and before the tug started ahead again, he saw a man wearing an "officer's cap" drop a line he was holding, wave his fingers as though he were hurt, and then make toward the bridge of the ship.

Captain Sjovall testified that the ship was making use of her engines during the docking operation. He also said that the hawser from the ship to the "Allentown" was a couple of hundred feet long, and there was nothing unusual in that length. He heard no communications between the "Allentown" and the stern of the ship, except that he "heard them holler to make it fast"; and he was not in touch with the men working back on the stern of the vessel. Captain Knowles said that he first heard about the libelant's accident after the ship was alongside the dock.

On this conflicting testimony I make the following findings:

When the ship arrived at the rack to which it was to be moored, the hawser was passed through the starboard stern chock, and the eye was made fast on the stern bitt of the "Allentown". Captain Baker, the master of the "Allentown," at that time told the libelant to take a figure 8 turn on the stern bitts of the ship and then slack off the line until the tug blew a one-whistle signal, at which time the line was to be made fast. The tug thereupon proceeded out against the tide about 200 feet, blew a one-whistle signal to the ship, and stopped to enable the ship's crew to make the line fast on the stern bitts.

I reject the testimony of the libelant that when the ship had about 60 feet of hawser out the tug shouted to "take up slack" and the tug backed up and "must have given about 10 feet of slack" to be taken up on the ship's capstan. In the first place, Captain Baker positively denied that anything like this occurred. Then, too, there was no necessity for shortening the hawser, as the evidence is clear that the tug needed a hawser of over 100 feet in length to maintain its position in the river against the strong ebb tide. Moreover, the slight amount of slack which the libelant says was actually taken up at the time was too insignificant to justify any such maneuver. I find, therefore, that at no time during the operation did the "Allentown" stop to take up slack in the hawser, as testified by the libelant.

After the tug had sounded the one-whistle signal, and had stopped, the libelant reported that the hawser was "all fast," and the tug thereupon, on orders from the docking pilot on the bridge of the ship, proceeded slowly ahead until it was seen that the hawser had started to render from the ship. This undoubtedly was the time when the first stopper parted, and it indicates that the libelant was using the capstan to hold the hawser, which the libelant had failed to make fast on the ship's stern bitts. The stopper was a light, 3/4-inch line, running from the bitt to the hawser to prevent the hawser from paying out while it was being made fast on the bitt, and it would not sustain the weight of the tug or the ship, nor would it withstand any strain put upon it by the operation of the tug's engines.

When the hawser rendered from the ship the tug came to a stop, and the libelant was at once advised, and again requested, to make the hawser fast on the ship. The tug remained stopped for a short time, and during this interval the second stopper was put on and the libelant sustained his injuries. This second stopper did not part, and the fact that it did not part shows conclusively that the tug did not go forward on its engines or put any strain on the hawser at the time the libelant was hurt. The tug waited until word was received from the ship that the hawser was fast and it was proper to proceed, when it went ahead, pulled the ship into position, and completed its assignment.

With these findings it is obvious that there was no negligence on the part of any of the respondents which caused or contributed to the libelant's injuries. The libelant was in complete charge of the operations on the stern of the ship. It

was his duty to see that the hawser was properly made fast on the stern bitts after the tug had proceeded out a sufficient distance to enable it to pull the stern of the ship towards the rack. This the libelant failed to do, and when the hawser rendered, the tug stopped and remained stopped until word was passed from the ship that the hawser had been made fast. It was while the tug was stopped that the libelant attempted to throw the hawser over the fairlead and his fingers were caught between the fairlead and the hawser. The libelant says that he was "pressed for time," but there is no evidence to that effect. In any event, I am satisfied that the libelant's own negligence was the sole cause of his injuries.

There may be a decree dismissing the libel and cross-libels, with costs to the respondents.